**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | )    No: 2:25-cr-166-LEW |
| OLIVIA "STEVIE" WILKINS | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

On July 13, 2026, Olivia "Stevie" Wilkins (they/them) will appear before this Court for sentencing. Defendant Wilkins accepts full responsibility for their conduct and recognizes that their actions caused law enforcement officers to fear for their safety and created a dangerous situation. They come before the Court with genuine remorse, without excuse, and with a clear understanding that they alone are responsible for the events that brought them here.

The question before the Court, however, is not simply what punishment the offense permits. It is what sentence is "sufficient, but not greater than necessary," to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a). That determination requires an individualized assessment of both the offense and the person who committed it. The advisory Guidelines inform that analysis, but they do not end it.

Although the offense is serious, this is the uncommon case in which the advisory Guidelines, properly calculated, and the individualized assessment required by § 3553(a) both demonstrate that further incarceration is unnecessary. The advisory Guideline range begins with U.S.S.G. § 2A2.4 (Obstructing or Impeding Officers), not § 2A2.2 (Aggravated Assault), because the record does not establish the intent to cause bodily injury required for aggravated assault under the Guidelines. Once the correct advisory range is established, the remaining § 3553(a) factors point decisively toward a sentence below the advisory range. The offense arose from an impulsive

1

and misguided attempt to intervene on behalf of another person, not from violence, personal gain, or a desire to inflict harm. The offense stands in stark contrast to the life Stevie has otherwise led, one defined by compassion, service, and an enduring commitment to the welfare of others. Moreover, Stevie has already withstood substantial punishment through humiliating media attention,[1] arrest, prosecution, and conviction, and will live with the lifelong consequences of a federal felony conviction. Those consequences, together with a substantial term of probation, are sufficient to accomplish the purposes of sentencing without imposing additional incarceration.

The First Circuit has repeatedly recognized that sentencing under § 3553(a) is necessarily individualized and that district courts possess broad discretion to determine which statutory factors warrant the greatest weight in a particular case. *United States v. Rivera-Rodríguez*, 75 F.4th 1 (1st Cir. 2023). That discretion includes the authority to conclude that, for a first-time offender, the cumulative burdens of a federal prosecution itself constitute substantial punishment that advances the purpose of sentencing. *United States v. Prosperi*, 686 F.3d 32 (1st Cir. 2012) (upholding probationary sentences despite an advisory guideline range of 87-108 months of imprisonment).

This case exemplifies the individualized determination contemplated by those decisions. Accordingly, this Memorandum first addresses the appropriate advisory Guideline, then explains why the § 3553(a) factors independently support a downward variance. And finally, it addresses

---

[1] Russ Reed, *Maine Woman Accused of Driving Car Toward Border Patrol Agent Pleads Guilty to Assault*, WMTW (Mar. 23, 2026, 2:06 PM EDT) https://www.wmtw.com/article/maine-woman-guilty-plea-driving-at-border-patrol-agent/70823089; *see also* Woman from Thomaston Pleads Guilty to Assaulting Border Patrol Agent in Portland, Maine, News Center Maine (Mar. 23, 2026) https://www.newscentermaine.com/article/news/local/public-safety/olivia-wilkins-thomaston-guilty-assaulting-border-patrol-agent-portland-maine/97-13bba276-eec5-4317-9521-6ce247a0c48b;  U.S. Dep't of Homeland Sec., *DHS Responds to Arrest of U.S. Citizen That Attempted to Run Down CBP Agent* (Aug. 29, 2025) https://www.dhs.gov/news/2025/08/29/dhs-responds-arrest-us-citizen-attempted-run-down-cbp-agent.

the proposed drug testing condition of supervision. For the reasons herein, the Court should impose a sentence of two years' probation.

## I. THE ADVISORY GUIDELINE IS GOVERNED BY U.S.S.G. § 2A2.4, NOT 2A2.2.

The Government agrees that Stevie's offense is governed by § 2A2.4 (Obstructing or Impeding), rather than § 2A2.2 (Aggravated Assault). That agreement is compelled by the text of the Guidelines themselves, which reserves § 2A2.2 for assaults committed with intent to cause bodily injury, not merely to frighten. Because the record does not establish such intent, Stevie's advisory Guideline range begins with § 2A2.4. The relevant facts confirm why that conclusion is correct.

### A. Factual Background Relative to the Guideline Determination.

On August 25, 2025, Defendant Stevie Wilkins came upon the scene of a serious motor vehicle accident in Washington, Maine. Amended Revised Presentence Investigation Report (hereinafter "PSR") (ECF. 38) ¶¶ 6-8. A commercial truck had overturned and was partially crushed. PSR ¶ 7. Two passengers were immediately transported to trauma centers, and two others were unable to exit the truck on their own and required extrication. ¶ 9A. See below:



One of the occupants of the truck stood bleeding from the head while a Border Patrol agent detained him roadside, PSR ¶ 7, as pictured below.



Concerned by what they observed, Stevie pulled their vehicle up to the accident scene and asked a local police officer what had occurred and why Border Patrol was taking the injured man into custody. [2] PSR ¶ 11. The officer was unable to answer Stevie's questions but instructed Stevie to move their vehicle down the road to observe the scene. Stevie complied and relocated to the parking lot of Washington Auto Parts where they were able to watch the unfolding events. PSR ¶¶ 11-12. Stevie's white car can be seen in the middle of the picture below, facing the accident scene.

---

[2] Local articles have highlighted the wrongful detention of immigrants living in Maine, (*e.g.*, Callie Ferguson, *A 'concerned' Mainer's tip got an immigrant wrongly detained for 65 days*, Bangor Daily News (June 13, 2025), https://www.bangordailynews.com/2025/06/13/mainefocus/mainefocus-police-courts/concerned-mainers-tip-got-immigrant-wrongly-detained-65-days-joam40zk0w/), as well as a growing pushback against CBP operations in Maine (*e.g.*, Sasha Ray, *Mainers alarmed by arrest of immigrants after midcoast traffic stop*, Bangor Daily News (Mar. 28, 2025), https://www.bangordailynews.com/2025/03/28/midcoast/midcoast-police-courts/montville-maine-traffic-stop-border-patrol-immigrants-arrest-backlash/). One article expressed that some Mainers were feeling wary of the blurry role local police played in immigration enforcement. John Terhune & Morgan Womack, *Maine immigrants, undocumented or not, 'walking on glass' as enforcement ramps up*, Portland Press Herald (Apr. 24, 2025), https://www.pressherald.com/2025/04/03/maine-immigrants-undocumented-or-not-walking-on-glass-as-enforcement-ramps-up/.



Shortly thereafter, the Border Patrol agent began escorting the injured, handcuffed man along the shoulder of the road toward his Border Patrol vehicle. PSR ¶ 14. As the pair proceeded, Stevie accelerated towards the crash scene, but abruptly stopped several yards away at two traffic cones. PSR ¶¶ 14, 14B. See below:



The Border Patrol agent immediately moved away from the shoulder of the road towards the brush, and at least one local officer drew a firearm. *Id.* While officers were startled, no one was harmed. Stevie then immediately left the scene. *Id.*

Local law enforcement pursued Stevie, locating them moments later, sitting in their vehicle which was disabled on the side of the road. PSR ¶ 15. When a deputy sheriff asked whether Stevie knew the injured man, Stevie responded that they did not know any of the individuals involved in the truck accident. Stevie added, "I was trying to stop him," referring to their desire to intervene in what they perceived as mistreatment of an injured man. PSR ¶ 18.

Viewed in context, the incident unfolded rapidly during an emotionally charged encounter involving an injured individual being taken into federal custody following a serious accident. The undisputed record reflects that the episode was brief, no physical contact occurred, and no one was injured. Stevie's actions were motivated by concern for the welfare of the injured individual, not by an intent to harm the Border Patrol agent. Those facts frame the guideline question now before the Court: whether this conduct constitutes an aggravated assault within the meaning of U.S.S.G. § 2A2.2, or instead, an attempt to obstruct or impede under § 2A2.4.

**B.  The Presentence Report Incorrectly Applies U.S.S.G. § 2A2.2 Because the Record Does Not Establish the Intent Required by the Sentencing Guidelines.**

Two possible Guidelines apply to Stevie's conviction under 18 U.S.C. § 111: U.S.S.G § 2A2.2 and § 2A2.4. The PSR applies § 2A2.2 on the premise that Stevie committed an "aggravated assault." That premise cannot be reconciled with the Sentencing Commission's narrow definition of "aggravated assault:"

> Aggravated Assault means a felonious assault that involved (A) a dangerous weapon[3] with intent to cause bodily injury (*i.e.*, *not merely to frighten*) with that weapon.

---

[3] The definition of "dangerous weapon" in § 2A2.2 cross-references the definition in § 1B1.1, and further states that a "dangerous weapon" "includes any instrument that is not ordinarily used as a weapon (*e.g.*, a

U.S.S.G. § 2A2.2, (comment). (n.1) (emphasis and footnote added). That parenthetical is not incidental. By expressly excluding conduct intended "merely to frighten," the Commission recognized that some assaults, while serious and criminal, do not constitute aggravated assault for purposes of § 2A2.2. Courts are obligated to interpret every provision of the Guidelines so that no language is rendered superfluous. *Setser v. United States*, 566 U.S. 231, 239 (2012) ("[W]e must give effect . . . to every clause and word" of a statute) (internal citation omitted); *United States v. Damon*, 595 F.3d 395, 400 (1st Cir. 2010) ("We determine the meaning the Sentencing Commission intended to give to Guidelines terms . . . by applying familiar principles of statutory construction.") (internal citation omitted). That principle is particularly important here.

Accordingly, this case turns on a single question: does the record establish, by a preponderance of the evidence, that Stevie intended to cause bodily injury rather than merely to frighten? The answer is no.

The undisputed facts undermine any inference that Stevie intended bodily harm. The record establishes a brief, impulsive episode lasting seconds, ending without physical contact or injury, and terminating when Stevie voluntarily stopped their vehicle. When later questioned, Stevie explained that the objective was to disrupt what was occurring, not to injure anyone. Those facts may establish reckless, alarming, and unlawful conduct. However, they do not establish the specific intent that § 2A2.2 requires.

---

car, a chair, or an ice pick) if such instrument is involved in the offense *with the intent to commit bodily injury*." (emphasis added). It appears, therefore, that to qualify as a "dangerous weapon" under § 2A2.2, a car must be used *with the intent to commit bodily injury*. Accordingly, because the record does not establish that Stevie intended to commit bodily injury, Stevie's vehicle would not meet the definition of "dangerous weapon" required by § 2A2.2.

Indeed, the contrary inference is difficult to sustain. The officer whom Stevie allegedly intended to injure was escorting the very individual Stevie sought to protect. Any attempt to strike the officer necessarily would have endangered that detainee as well. Thus, the physical circumstances undermine the inference that Stevie intended to inflict bodily injury rather than interrupt what Stevie perceived to be occurring.

In sum, the record does not establish that Stevie acted with intent to cause bodily injury, and therefore, the applicable guideline is § 2A2.4. This conclusion is consistent with Stevie's nonviolent history and drive to improve the lives of vulnerable individuals, discussed below in Section II.

### C. Cases Cited in the PSR Are Inapposite.

The PSR principally relies on *United States v. Valdez-Torres*, 108 F.3d 385 (D.C. Cir. 1997), and *United States v. Gonzalez-Agundis*, 2026 WL 1180536 (5th Cir. Apr. 30, 2026). Neither decision supports application of § 2A2.2 on this record.

In *Valdez-Torres*, the defendant was a fugitive attempting to avoid capture. *Id.* at 390. The defendant drove his vehicle directly toward an immigration officer and when the defendant received verbal warnings that he was about to make contact with an officer, he "*did not stop.*" *Id.* at 386 (emphasis added). The D.C. Circuit concluded that those facts supported an inference that the defendant intended bodily harm rather than intimidation. *Id.* at 388.

Likewise, in *Gonzalez-Agundis*, the defendant, while *fleeing* Border Patrol agents, suddenly "stopped, pulled out a knife, and—with the knife in his hand—turned towards [an approaching] agent in a threatening manner," ignored repeated commands to disarm, and continued resisting after being tased. 2026 WL 1180536 at *1. Considering the totality of those

circumstances, the Fifth Circuit concluded that the district court could reasonably infer an intent to cause bodily injury. *Id.* at *2.

Neither decision stands for the proposition that a fleeting attempt to interrupt a third-party's arrest is enough. On the contrary, both courts identified affirmative evidence demonstrating an intent to injure. That evidence is absent here. Unlike the defendant in those cases, Stevie voluntarily stopped the vehicle at the orange cones on the perimeter of the accident scene, without prompting from law enforcement. Stevie was not escaping arrest, did not continue advancing after warnings, and did not engage in conduct from which an intent to strike the Border Patrol agent could reasonably be inferred. The distinctions are not factual minutiae. They are the very facts from which the courts in *Valdez-Torres* and *Gonzalez-Agundis* inferred the intent required by § 2A2.2.

**D. Guideline Calculation Under § 2A2.4 (Obstructing or Impeding Officers)**

Under § 2A2.4, the guideline calculation is as follows:

- Base Offense Level: 10 (§ 2A2.4(b)(1)(A))

- Dangerous Weapon Enhancement: +3 (threatening use of vehicle) (§ 2A2.4 (b)(1)(B))

- Acceptance of Responsibility: -2 (§ 3E1.1(a))

- Total Offense Level: 11

With a Criminal History Category I, the advisory guideline range is 8-14 months in Zone B.

**II. STEVIE'S LIFE DEMONSTRATES THAT THE OFFENSE WAS A GRAVE ERROR IN JUDGMENT, NOT A REFLECTION OF THEIR CHARACTER.**

The record in this case presents an unusually consistent picture of Stevie's character, one that is corroborated by family members, longtime friends, community members, and the PSR

itself.[4] Together, these independent sources describe a person whose defining characteristic is a deep and enduring concern for the welfare of others. Although each writer knows Stevie in a different capacity, their descriptions are remarkably consistent. Friends describe Stevie as someone who routinely places the needs of others before their own, whether by caring for vulnerable community members, supporting friends through periods of crisis, or volunteering their time despite significant physical limitations. Family members recount a lifetime of similar conduct, beginning in childhood and continuing into adulthood. Stevie's brother-in-law, a veteran of the U.S. Air Force, remarked that although "Service before Self" is one of the Air Force's core values, he had never "met a civilian who embodies that value better than Stevie."[5] Stevie's sister-in-law writes:

> Throughout the time I have been blessed to know Stevie, I have had the joy to witness her loving heart and the way she has worked to give back to others. As a young girl and well into her young adult years Stevie participated in numerous Church mission focused trips including but not limited to, multiple trips to Kenya, Rwanda and Uganda. While on these mission trips she participated in health programs, that included the work of removing jiggers from infected feet, treating infections, assisting with childcare, entertainment and storytelling at orphanages and schools, and finally bringing food and resource distribution to various communities.[6]

And Stevie's sister writes:

> Our parents had six biological children, then when Stevie was in high school, they left her in their suburban home in Texas to move to Uganda to adopt four more children. They stayed there for over a year . . . Stevie was kindly supportive and understanding of our parents throughout this abandonment, as she felt that our soon-to-be adopted siblings needed support more than she did.[7]

---

[4] *See generally*, Letters of Support, marked as Def.'s Ex. 1-7.
[5] Letter of support from Donald J. Moreland, marked as Def.'s Ex. 1.
[6] Letter of Support from Sarah Wilkins, marked as Def.'s Ex. 2.
[7] Letter of Support from Freyja Grey, marked as Def.'s Ex. 3.

These accounts reveal a consistent pattern of conduct spanning many years. Friends recount Stevie helping a woman stranded at a rural gas station escape an abusive situation, opening their home to those in crisis, providing emotional support during periods of profound personal loss, and regularly assisting neighbors, family members, and strangers without expectation of recognition or reward.[8]

The PSR independently corroborates this portrait. Stevie describes their own greatest strengths not in terms of achievement or ambition, but simply, "I am a good listener, fairly smart but mostly I care and am considerate. I want people to live in safety and have their needs met, and I feel responsible on some level to do good where I can." PSR ¶ 51. Likewise, the PSR reflects Stevie's sister's description of them as "an incredibly principled and empathetic person" who "would be the first to jump in and help." PSR ¶ 50.

Importantly, these qualities developed despite extraordinary adversity. The PSR documents a childhood marked by physical abuse, emotional neglect, prolonged parental absence, and significant untreated medical needs. PSR ¶¶ 47, 50, 50A. Yet there is no indication that Stevie responded to those experiences with bitterness or criminal conduct. To the contrary, Stevie reached adulthood with no prior arrests, no substance abuse history, no history of violence, and a demonstrated commitment to helping others whenever their health permitted.

Stevie's history also reflects remarkable resilience. Stevie has endured years of debilitating chronic illness, severe pain, and financial instability, all while remaining active in their community to the extent their health allowed. The PSR explains that Stevie's medical conditions significantly

---

[8] Letter of Support from Ignatius B. Parker, marked as Def.'s Ex. 4 ("I met Stevie last spring through a community event at which our shared role was to provide water, snacks, and basic first aid for participants."); Letter of Support from Skyler Duhon, RN, marked as Def.'s Ex. 5; Letter of Support from Madison "Sonnie" Chauvin, marked as Def.'s Ex. 6.

limit daily functioning and have repeatedly interfered with employment, PSR ¶ 60, yet letters consistently describe someone who continued showing up for friends, volunteering, caring for animals, and assisting vulnerable members of the community despite those limitations. Stevie's sister writes:

> [A]s soon as Olivia/Stevie hit puberty, she became very ill with endometriosis and myriad symptoms of autoimmune disease. I have never witnessed such debilitating pain in a person, and it became routine that she would miss a whole week of her life every few weeks as she increasingly became incapacitated . . . these symptoms left her with brain fog and dizziness, migraines that induced vomiting, and stabbing abdominal pain that left her in bed. Witnessing it firsthand for years was deeply concerning, and I was frustrated at the subsequent treatment by employers and lack of care by doctors. I cannot imagine what she feels on a daily basis.[9]

None of this excuses Stevie's conduct on August 25, 2025. Stevie accepted responsibility for the offense and recognizes that their actions placed others in fear. But the same evidence that demonstrates Stevie's culpability also helps explain why this offense occurred. The conduct arose from an impulsive and profoundly misguided attempt to intervene in what Stevie perceived to be an injustice involving an injured individual. The Court need not approve of that judgment to recognize that it reflects the same deeply rooted impulse to protect others that has otherwise defined Stevie's life.

That distinction matters for purposes of § 3553(a). Sentencing requires not only an assessment of what occurred on a single afternoon, but of who stands before the Court. Here, the record overwhelmingly demonstrates a grave lapse in judgment by an individual whose life has otherwise been characterized by compassion, service, and an unusual commitment to the well-being of other people. Stevie's conduct was a product of genuine humanitarian concern, not criminal intent.

---

[9] Def.'s Ex. 3, *supra* n.7.

For these reasons, Stevie's history and characteristics strongly support a sentence that reflects accountability while recognizing both the highly atypical nature of this offense and Stevie's minimal risk of recidivism. A sentence of two years' probation appropriately reflects both realities.

### III.    FURTHER INCARCERATION WOULD NOT ADVANCE THE PURPOSES OF SENTENCING.

Congress directed the Sentencing Commission to ensure that prison resources are reserved "first and foremost" for offenders who pose the greatest danger to the public, while encouraging the use of alternatives to incarceration where they adequately accomplish the purposes of sentencing. Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984). That directive reflects an important principle: imprisonment is not an end in itself. It is warranted only when necessary to accomplish the statutory purposes identified in § 3553(a).

This is not such a case.

Nothing in the record suggests that Stevie is the type of offender for whom incarceration is necessary. Stevie is twenty-five years old, has no criminal history, no history of violence, no history of substance abuse, and no pattern of unlawful behavior. The offense did it arise from a continuing course of criminal conduct. Rather, it resulted from a singular, impulsive decision during an emotionally charged encounter that Stevie immediately recognized as profoundly wrong. Thus, everything else in Stevie's life points in the opposite direction of incapacitation.

The record reflects years of humanitarian service, extraordinary compassion toward others, and a consistent willingness to place the needs of vulnerable people ahead of their own. Nor does Stevie present the type of offender from whom society must be protected through incarceration. Stevie has fully accepted responsibility, complied with every condition of pretrial release, and demonstrated genuine remorse throughout these proceedings. Stevie also suffers from debilitating

13

chronic medical conditions that significantly restrict daily functioning and make recidivism even less likely. The extensive network of family and community support described throughout the record further reduces any realistic risk that Stevie will reoffend.

Indeed, incarceration risks undermining many of the very factors that make future criminal conduct unlikely. Stevie's medical care is ongoing. Their rehabilitation depends upon continued access to specialized treatment, stable housing, meaningful community relationships, and the support network that has sustained them throughout this prosecution. The proposed sentence preserves those stabilizing influences while continuing to hold Stevie accountable.

The First Circuit has recognized that the burdens of federal prosecution themselves constitute meaningful punishment for first-time offenders. *Prosperi*, 686 F.3d at 48–49. Stevie has already experienced those burdens. They have been arrested, detained, publicly prosecuted, convicted of a federal felony, and will carry the lifelong consequences of that conviction long after this case concludes. Those consequences, combined with a substantial period of probation, provide significant punishment and meaningful deterrence without requiring additional incarceration.

This case therefore presents the unusual circumstance in which every legitimate purpose of sentencing can be achieved without further imprisonment. Additional incarceration would not materially increase respect for the law. It would not meaningfully enhance deterrence. It would not better protect the public. Nor would it provide the medical treatment needed. Instead, it would impose punishment beyond what is necessary to accomplish the purposes Congress identified in § 3553(a).

A sentence of two years' probation more faithfully reflects those statutory objectives.

14

## IV.   THE COURT SHOULD SUSPEND THE MANDATORY DRUG-TESTING CONDITION.

Pending before the Court is the defense's unresolved objection to mandatory drug testing as a condition of Stevie's supervision. In determining what conditions of supervision are appropriate in any given case, a court must consider the factors set forth in 18 U.S.C. § 3553(a). 18 U.S.C. §§ 3562(a), 3583(a). No condition can impose a greater deprivation of liberty than that which is reasonably necessary. 18 U.S.C. § 3553(a). Drug testing as a condition of supervision "may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable sentencing information indicates a low risk of future substance abuse by the defendant." 18 U.S.C. §§ 3563(a)(5), 3583(d). Here, there is no evidentiary basis to support a drug testing condition.

The advisory guideline range is 8-14 months, reflecting an extremely low risk profile. The offense has no connection to controlled substances. Stevie's only history of drug use is limited to marijuana for the alleviation of symptoms associated with endometriosis. PSR ¶ 57. Critically, while on pretrial release, no drug-testing condition was imposed as such was deemed unnecessary to mitigate risk, and there have not been any compliance issues. PSR ¶ 4. Also, Probation did not recommend a condition for substance abuse evaluation or treatment. One can infer this is because Probation did not identify the need for intervention of this nature. We agree.

There is no demonstrated need for monitoring, treatment or deterrence related to substance use in this case. To impose such a condition would be adding a restriction for its own sake, not because it serves a legitimate sentencing goal. There is no link between the offense conduct and marijuana use, and without such a nexus, drug testing cannot satisfy the statutory requirement that conditions be reasonably related to the purposes of sentencing.

15

Suspending drug testing is also consistent with this District's prior practices. Over the last three years, judges in this District have waived the drug testing condition in six of undersigned counsel's cases alone, despite the defendants' histories of marijuana use.[10] Stevie is similarly situated to the defendants in those cases. Imposing a drug testing condition in their case would violate the need to avoid unwarranted sentence disparities among similarly situated defendants.

Because there is no individualized, evidence-based justification for a drug-testing condition, the Court should suspend drug testing in this case.

## IV.    CONCLUSION

For the reasons set forth above, Stevie Wilkins respectfully requests that this Court impose a sentence of two years' probation. Additional incarceration would be greater than necessary.

If the Court determines otherwise, Stevie respectfully requests to self-report to the Bureau of Prisons and requests the Court recommend their designation to a minimum-security prison camp in New England.

Your Honor's thoughtful consideration of this Memorandum is very appreciated.

Dated: July 6, 2026

/s/ Heather Gonzales, Esq.
Attorney for Defendant
Senior Litigator, Federal Public Defender
P.O. Box 595
Portland, ME 04112-0595
207-553-7070
FAX: 553-7017
Heather_Gonzales@fd.org

---

[10] *See U.S. v. Vachon*, Docket No. 2:25cr-37-LEW (false information to a licensed firearm dealer); *U.S. v. Joaquin*, Docket No. 2:24-cr-20-JAW (theft of mail by postal employee); *U.S. v. Kimball*, Docket No. 2:22-cr-85-JDL (sexual exploitation of a minor & distribution and possession of CSAM); *U.S. v. Knof*, Docket No. 2:23-cr-106-NT (distribution and possession of CSAM); *U.S. v. Rembert*, Docket No. 2:24-cr-33-LEW (possession of CSAM); and *U.S. v. Littlefield*, Docket No. 2:25-cr-176-SDN (theft of mail by postal employee).

**CERTIFICATE OF SERVICE**

I, Heather Gonzales, Esq., hereby certify that I have this date caused the within Sentencing Memorandum to be served upon all parties of record via the Court's ECF System.


Dated: July 6, 2026                                      /s/ Heather Gonzales
                                                        Counsel for the Defendant